# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *First American Bank v. Village of Wilmette*, 2019 IL App (1st) 181436

</div>

| | |
|---|---|
| Appellate Court Caption | FIRST AMERICAN BANK, Formerly Known as Old Orchard Bank and Trust Company, Under Trust Agreement Dated October 5, 1979, Known as Trust No. 8026; RAS DEVELOPMENT, INC., an Illinois Corporation; and ROSA LEVIN, an Individual, Plaintiffs-Appellants, v. THE VILLAGE OF WILMETTE, an Illinois Municipality, Defendant-Appellee. |
| District & No. | First District, Fourth Division No. 1-18-1436 |
| Filed Rehearing denied | December 26, 2019 January 23, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CH-26657; the Hon. Sanjay T. Tailor, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Ronald S. Cope, Kevin A. Ameriks, and Thomas J.K. Schick, of Schain, Banks, Kenny & Schwartz, Ltd., and J. Samuel Tenenbaum and Christian Huehns, of Northwestern Pritzker School of Law, both of Chicago, for appellants. |
| | Barbara A. Adams and Benjamin L. Schuster, of Holland & Knight LLP, of Chicago, for appellee. |

Panel          PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Lampkin and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1      The instant appeal arises from the denial of several zoning variances sought by plaintiffs for the development of a parcel of real property located in the Village of Wilmette (Village). While the Village's Zoning Board of Appeals (Zoning Board) voted to recommend that the variances be allowed, the Village Board of Trustees (Village Board) ultimately voted to deny the variances. Plaintiffs—the land trust holding title to the property, the beneficiary of the land trust, and the proposed developer of the property—filed an action in the circuit court of Cook County, seeking a declaratory judgment that the plan should be approved. After a bench trial, the trial court found in the Village's favor and upheld the denial. Plaintiffs appeal, and for the reasons set forth below, we affirm.

¶ 2                                          BACKGROUND
¶ 3                                          I. Complaint
¶ 4      On September 21, 2007, plaintiffs filed a complaint in the circuit court of Cook County concerning the Village's denial of several zoning variances sought by plaintiffs. The complaint was amended several times, and it is only count I of the third amended complaint, filed January 18, 2011, that ultimately proceeded to trial. Accordingly, we draw our discussion of the allegations from that count.

¶ 5      The complaint alleges that, in 1979, plaintiff Rosa Levin and her husband Robert (collectively, the Levins) purchased a 37,869.42 square-foot parcel of real property located in the Village, which was improved with a single family residence. The remainder of the parcel was left vacant, with the Levins permitting neighbors to use the open space to host neighborhood events. In 2006, the Levins developed a plan to subdivide the property into three buildable lots located on a cul-de-sac they would create off of Old Glenview Road. They later abandoned this plan due to concerns about how the cul-de-sac would affect the adjoining neighbors' compliance with the required zoning setback requirements.

¶ 6      Instead, the Levins developed a new plan, which would create three buildable lots with a shared private driveway. The plan also provided for a rain garden to be used as a retention pond to be planted on an "outlot" along Old Glenview Road, which would catch excess rainwater runoff in addition to beautifying the area. The complaint alleges that the three buildable lots conformed to the Village's minimum setback requirements for front yards, side yards, and rear yards, and the size of the lots exceeded the minimum lot area required under the Village's ordinance. However, the buildable lots did not satisfy the 60-foot lot width requirement due to the unique shape of the property.[1]

---

[1]While it is an imperfect analogy, the general shape of the parcel is similar to that of the state of Nevada, with a narrow southeastern portion of the parcel fronting Old Glenview Road, then expanding in both width and depth to the north and northwest. The front lot line of the parcel, fronting Old Glenview Road, measures 52.03 feet, expanding to 214.58 feet at its rear lot line.

¶ 7        The complaint alleges that, on March 8, 2007, the Levins applied for three variances from the Village for their property: (1) a variance for the lot width of the three buildable lots, (2) a variance for the size of the outlot, and (3) a variance permitting the buildable lots not to have frontage on Old Glenview Road. They presented their plan at a public hearing to the Zoning Board on May 2, 2007, including presenting testimony of a land planner, an engineer, and two real estate appraisers. The Zoning Board voted 4 to 2 to recommend to the Village Board that the plan be approved. However, on June 26, 2007, the Village Board voted to reject the plan by a vote of 5 to 1,[2] prompting the instant lawsuit.

¶ 8        Count I of the complaint sought a declaratory judgment that the Village's denial of the variances was arbitrary, capricious, and unreasonable and was unrelated to public health, safety, and general welfare of the community. Count I further sought an order enjoining the Village from interfering with the development of the property and a court order granting the requested variances.

¶ 9                                              II. Trial
¶ 10       The parties came before the trial court for a bench trial beginning on May 8, 2018.

¶ 11                                A. Plaintiffs' Case-in-Chief
¶ 12                                    1. Lawrence Dziurdzik
¶ 13       Lawrence Dziurdzik testified that he is a professional land planner and designer and created a plan for the subject property in 2006. Dziurdzik testified that the property was zoned as R1-A, which was a single-family residential zoning district with a minimum lot size of 8400 square feet with a 60-foot minimum lot width. Dziurdzik examined the neighborhood around the subject area, counting approximately 150 lots. Of those lots, 38.7% did not comply with the lot-width standard. Dziurdzik testified that, according to the Village's formula for measuring lot width, the three proposed lots on the subject property would not meet the 60-foot requirement. However, if the lot width was measured at the midpoint of the lots, each lot would satisfy the requirements of the ordinance. All three lots, as proposed, would satisfy the Village's rear-, side-, and front-yard requirements and would exceed the minimum lot size requirement.

¶ 14       Dziurdzik testified that, in the plan his company prepared for the property, the planners took into consideration the irregular shape of the property, including its large size and limited frontage on Old Glenview Road. They concluded that a plan of three buildable lots would be consistent with uses in the neighborhood and fit in with its overall character, as well as preserving the existing landscaping. The front of the property would consist of an "outlot," a common lot that would contain a rain garden to be used as a retention pond, and the property would keep the existing spruce trees and provide for a "generous" driveway. The driveway was proposed to be 20 feet wide and constructed in such a way that it could accommodate a heavy piece of fire equipment; the driveway narrowed to 12 feet at its narrowest point. It also contained a "turnaround" area at the end of the third lot that would permit a vehicle to turn

_____

[2]While the complaint alleges that the vote was 5 to 1, the meeting minutes show that the vote was 6 to 1.

around. Dziurdzik further testified that the homes proposed in the plan would include sprinkler fire suppression systems.

¶ 15 Dziurdzik testified that the outlot would be a common area that would be maintained by the three homeowners. Such common areas exist in other areas of the Village and are maintained by homeowners' associations. On cross-examination, Dziurdzik testified that, in his study of the lots in the neighborhood, there were no other lots that did not front onto a public street and that the outlot would be "very unique to this area."

¶ 16 Dziurdzik testified that there was a new development immediately to the north of the subject property that consisted of an eight-lot subdivision centered around a new cul-de-sac. Dziurdzik admitted that the new subdivision included the creation of a new public road and that the plans for the subdivision did not request variances for lot width. Dziurdzik testified that the existence of this development demonstrated the need in the community for single-family homes.

¶ 17 Dziurdzik testified that the western part of the Village, where the subject property was located, was "not well thought out" in terms of planning, with a number of cul-de-sacs and variations in street pavement, as well as "a hodgepodge or crazy quilt of lots of irregular sizes."

## 2. David Shindoll

¶ 18

¶ 19 David Shindoll testified that he is a civil engineer and had been retained in 2006 to prepare a drainage plan for the subject property that would not adversely affect the adjacent parcels. He testified as to the details of the plan that he had created. Shindoll further testified as to a vehicle geometry analysis that he had completed concerning the turning radius of a fire truck into the proposed driveway, which concluded that a fire truck would be able to turn onto the driveway coming from either direction off Old Glenview Road.

## 3. Plaintiff Rosa Levin

¶ 20

¶ 21 Plaintiff Rosa Levin testified that she and her husband purchased the subject property in 1979 for $105,000. The property contained an 1800-square foot house, and the rest of the property was open land. There was no fence on the property, and "every party that we ever had in the neighborhood" was in the yard. The Levins decided to develop the property when they realized that their property taxes were much higher than recently developed properties and hired professionals to develop a plan for the property. They presented the plan to the Zoning Board, which was "pretty much in favor of it all." Levin testified that "everything that the Village wanted, we did, and they gave us their blessing." However, Levin testified that, despite telling her that they were in favor of the plan, her neighbors met behind her back to complain about the development and the fact that they would lose the backyard space that they used as a park. The neighbors appeared at the hearing before the Village Board and objected to the proposed development, citing concerns about construction and traffic.

¶ 22 Levin testified that, two doors down from her property, there was a property with two residences on one lot, which were connected by a long driveway servicing both residences.

## 4. Charles Schwarz

¶ 23

¶ 24 Charles Schwarz testified that he is a residential real estate appraiser who had been retained by plaintiffs in 2006 to appear before the Zoning Board in connection with the property.

Schwarz characterized the neighborhood in which the property was located as consisting of "modest homes," ranging in size from 1500 to 5000 square feet. Schwarz testified that the property as currently developed, containing the 1800-square foot house, had a value of approximately $450,000 as of the date of his most recent appraisal on November 10, 2013. With the three lots as proposed, the values of those lots would be $325,000, $330,000, and $335,000, as of the same date. Schwarz testified that, if the property was permitted to develop in accordance with the plan, it would increase the value of the surrounding properties. Schwarz testified that, in his opinion, the highest and best use of the property would be to develop it with the three sites as proposed.

¶ 25    On cross-examination, Schwarz testified that he was not shown any plans for the houses to be built upon the sites and that his opinions as to the impact on the neighborhood was based on the assumption "that the proposed homes would be comparable and fit in well with the neighborhood."

¶ 26                              B. Village's Case-in-Chief
¶ 27                                  1. Lisa Roberts
¶ 28    Lisa Roberts testified that she is employed by the Village as the assistant director of community development, which included providing support to the Zoning Board and staffing the administrative zoning review committee; at the time of plaintiffs' application, she was serving as the director of community development. Roberts testified that, in the course of her duties, she used the Wilmette Comprehensive Plan, which was the primary policy document for land use decisions in the Village. The Village's zoning ordinance was intended to implement the goals and policies of the comprehensive plan, and Roberts testified to the provisions of the zoning ordinance involving the subject property.

¶ 29    Roberts characterized the Village as a "mature community" and testified that there was very little unused land in the Village, other than parks and forest preserves; most of the single-family home development in the last 10 to 15 years had consisted of teardowns and new construction. To the extent that there were subdivisions, most subdivisions consisted of separating one lot into two; Roberts testified that the four-lot subdivision proposed by plaintiffs was "rather unusual" and that the proposal for an outlot was "very unusual" for the Village.

¶ 30    Roberts testified that if an individual wanted to request a zoning variance, the homeowner would typically begin by contacting the Zoning Board's staff to ask questions about the process. The staff member could meet with the homeowner in person or, if the project was small, could communicate with the homeowner through phone and e-mail. In plaintiffs' case, staff met with plaintiffs' attorney and Shindoll in January 2007 to discuss a site plan. Based on the meeting, the attorney submitted the site plan for review by the site plan review committee, which was responsible for looking at traffic and landscaping issues. The committee met to discuss the plan and had a number of suggestions, many having to do with the "unusual condition of the proposed outlot." Roberts testified that the staff had never been presented with an outlot to be used as a retention pond with an adjacent driveway, "so we wanted to make sure everybody understood exactly what was being proposed and could comment on it." Roberts testified that the primary concern was how to obtain Village services for the three lots, including fire and emergency access and utilities; Roberts explained that the proposed driveway would occupy 20 feet of the 53-foot frontage, so there was only approximately 30 feet of frontage through which three water services and three sewer services would need to

run. There were also concerns about stormwater drainage. Roberts forwarded a letter with the committee's comments to plaintiffs' attorney in February 2007.

¶ 31 Roberts testified that plaintiffs submitted their application for variances in March 2007. Roberts explained that the Zoning Board would consider zoning variations, such as the lot-width variances, while a separate Plan Commission would consider issues concerning proposed subdivisions; the Village ordinance required that variances be granted before a plat of subdivision could be approved, so plaintiffs' application to the Zoning Board was the first step in the process. Plaintiffs requested three lot-width variances for the three buildable lots: for a reduction from 60 feet to 53 feet, from 60 feet to 52.03 feet, and from 60 feet to 51.7 feet. Each lot also needed a variance from the requirement that the lot front on a public street. Finally, the proposed outlot needed a variance because it did not meet the Village's minimum lot size requirement. Roberts testified that plaintiffs never asked to have the lot-width calculated from a different point or suggested that the lot-width measurements were incorrect.

¶ 32 Roberts testified that, after providing notice, the next step in the process was a public hearing before the Zoning Board, which was a quasi-judicial body that heard testimony, considered evidence, made findings of fact, and made a recommendation to the Village Board, which would then take final action on the request. At the hearing, Roberts would call the case; the applicant would present his or her request, including any witnesses or experts; and the Zoning Board members would ask questions. After the applicant finished their presentation, the chairman of the Zoning Board would invite any audience members or interested parties to speak. The applicant would then have an opportunity to address any comments or questions that had been raised. Once all follow-up questions had been answered, the chairman would close the hearing, the Zoning Board would discuss the matter, and a vote would be taken on the request. In plaintiffs' case, the Zoning Board voted 4 to 2 to recommend granting the request. At that point, the matter proceeded to the Village Board for its review.

¶ 33 Roberts testified that the Village Board would be presented with the same documentation that had been presented to the Zoning Board. In addition, the Village Board would receive the minutes from the Zoning Board's meeting, any additional materials submitted at the Zoning Board's meeting, the written recommendation, and a record of the vote. At the Village Board's meeting, there was again an opportunity for the applicant or interested parties to present their case, including answering questions from the Village Board members, and there would be discussion and vote on the matter. In plaintiffs' case, the Village Board voted 6 to 1 to deny the request.

¶ 34 Roberts testified that her role in the application process was to provide technical assistance to the officials and to provide information to them, as well as to assist the applicant through the process. She did not make any statements in favor or against proposals, but merely made comments as to the types of issues that would need to be addressed if a request was to be approved.

¶ 35 Roberts testified that she was familiar with the eight-lot subdivision adjacent to plaintiffs' property. In that case, one of the lots initially received a lot-width variance because the property owner was attempting to preserve the existing house on the property; however, the subdivision did not ultimately develop pursuant to that plan, and the plan that was developed did not require any lot-width variances.

¶ 36    Roberts testified that, with respect to the lot near the subject property which appeared to have two homes served by one driveway, the parcel was a single lot and the second structure appeared to be either an accessory structure or an unpermitted second primary dwelling.

¶ 37    Roberts testified that, in 2014, the Village implemented a new zoning ordinance. Under this new ordinance, certain areas had a reduced lot-width requirement to account for areas that had historically been developed with smaller, narrower lots; the subject property remained in an area that was subject to the 60-foot lot-width requirement. Roberts testified that if the subject property remained one parcel, the Levins could build a single-family home up to 12,000 square feet on the property.

¶ 38    Roberts testified that she was aware of three private roads in the Village that served single-family homes.

¶ 39                                                    2. Leslie Pollock

¶ 40    Leslie Pollock testified that he is a city planner and drafted the Village's zoning ordinance. Pollock was retained by the Village to analyze plaintiffs' proposed development, and he concluded that the proposed variances were not in keeping with the character of the Village. Pollock opined that the structure of the requested variances would result in a development pattern that did not fit the character of the development along Old Glenview Road or within the neighborhood. Pollock further opined that, within the immediate area, the character of the development would be in conflict with the character of the adjacent housing. Pollock also opined that there was no hardship in denying the variance.

¶ 41    Pollock testified that the area containing the subject property was originally part of the Village of Gross Point, a farming community that existed until approximately 1922. The lots that were originally in the Gross Point area were largely used for small farms and were purchased and subdivided individually, leading to a less-uniform pattern of development as compared to the eastern portion of the Village, which was developed in a more gridlike system. The lot containing the subject property appeared to have been portioned off and subdivided until the subject property was the only remaining parcel and could not be further divided. Pollock testified that the current minimum lot-size and lot-width requirements were in place when the Levins purchased the property in 1979.

¶ 42    Pollock testified that, if the outlot did not exist and the three lots extended to the street, the variance for frontage would no longer be required, as all three lots would front on Old Glenview Road. However, because the property narrows as it approaches Old Glenview Road, extending the three lots to the road would lead to each lot being substantially less than the 60-foot lot-width requirement; Pollock estimated that the lot widths could be as narrow as 30 feet. By beginning the lots further back, where the property is wider, the lot-width measurement was closer to the 60-foot minimum, albeit still slightly less.

¶ 43    Pollock testified that his firm assisted in amending the Village's zoning ordinance in 2014 and, as part of that assignment, his firm analyzed all of the lot widths and lot areas in the Village. They discovered that 57% of all lots in the Village were nonconforming with respect to lot width, leading to a reconfiguring of the zoning districts into nine different categories. Zone R1-A, which was the zone in which the subject property was located, remained subject to a 60-foot lot-width requirement. Pollock further explained that zoning requirements were applicable to future development—the Village would not require a nonconforming structure to be torn down, but once it was no longer present, it would not be permitted to be replaced.

¶ 44 Pollock testified that the analogy to a condominium association, which also had common ownership of property, was inapposite, as condominiums were located in zones that permitted multifamily residences. The requirement that a lot must front a public street was specific to single-family homes, as present in the case at bar. In the case of a condominium, the common front yard would satisfy the zoning requirements applicable to multifamily residences. Pollock described the two situations as "apples and oranges." Pollock further testified that, in a condominium situation, the common areas were typically part of the lot while, here, the common ownership would be of an independent lot.

¶ 45                                    3. James Dominik

¶ 46 James Dominik testified that he had served as the Village's fire chief from 2006 until his retirement in 2015 and had served as a member of the Village's site plan review committee in that capacity. Dominik's role on the committee concerned responsibility for fire safety and emergency related issues. After his retirement, the Village retained him to render certain opinions in the instant case. Dominik testified that, after reviewing the information provided to the Zoning Board, as well as fire service standards and procedures, he opined that plaintiffs' proposed development posed "significant concerns and hazards to life safety and emergency services delivery to the property, due to the setbacks." Dominik testified that he was concerned about the distance from the street, as well as the fact that emergency services would have to travel through the outlot to reach the properties.

¶ 47 Dominik testified that the standard response to a fire alarm at a home would require, at a minimum, a fire engine that was 30 feet long and 8 feet wide; a truck equipped with aerial equipment, which was 47 to 48 feet long and 8 feet wide; an ambulance; and a van carrying a battalion chief. There would be a total of nine responders and four pieces of equipment. Dominik testified that they always positioned their equipment at the property as though there was a fully-involved structure fire, meaning that the aerial truck would be positioned in front of the building so that it could be reached with the ladder, leaving room for another aerial truck if necessary, and then the "pumpers" would be placed around the area. Dominik testified that they would not take the aerial truck onto a private driveway or onto private property "under any circumstances" because of the weight and size of the truck. The truck weighs 78,000 pounds and, when its outriggers were deployed, reached a maximum width of 20 feet. Dominik testified that they are able to reach the majority of the homes in the Village by parking on the street and extending the 100-foot-long aerial apparatus.

¶ 48 Dominik testified that if the call was in response to a report of an active fire, as opposed to an alarm, the same equipment would be deployed, plus two additional fire engines from Winnetka and Glenview and two additional aerial trucks from Evanston and Northfield. There would also be a "squad," which was a "mobile tool box" containing extra equipment, as well as a second ambulance from Glencoe and three additional chiefs, each of which arrived in their own vehicle.

¶ 49 Dominik testified that if there was a "box alarm," which was a "working structure" fire, they would have yet more equipment, including a fire engine from Lincolnwood, an aerial truck from Northbrook, a squad from Skokie, an ambulance from Highland Park, a chief officer from Northfield and Evanston, and a communications vehicle. There would also be a "canteen," which would be used to replenish the firefighters, and an engine company from

Niles would be deployed to respond to any other calls within the Village while the fire was being fought.

¶ 50 Dominik testified that, under plaintiffs' proposed development, the properties would be set back too far for the aerial ladders to reach. He further testified that, while the 200-foot long hoses from the fire engines could reach the homes, they might not be long enough to reach inside the home to the source of the fire. Dominik testified that the aerial truck theoretically could be set up on the proposed driveway if it was positioned "perfectly," but that the curve in the driveway would lead him to believe that it could not be done due to the length of the truck and the outriggers. Dominik also noted that the ground on either side of the driveway sloped downward "substantially." Dominik testified that there were a handful of properties in the Village on narrow streets that presented difficulties, but that all of them were on older roads that predated the development of aerial equipment and were built during a time of smaller fire equipment.

¶ 51 Dominik testified that he was asked to comment on plaintiffs' proposed plan when he was on the site plan review committee in 2007 and noted in his comments that the fire department required a minimum 20-foot clearance that could support up to 90,000 pounds and provide an entrance and an exit. Dominik testified that the 20-foot comment concerned the width of the truck, not the width of a driveway and that a 20-foot driveway would be insufficient and would also be inconsistent with the department's policy of never using a private driveway. Dominik also recommended the installation of sprinklers, which he recommended at "[e]very opportunity" for any new construction. Dominik testified that sprinklers made homes safer, but did not eliminate the need for a fire department. Dominik testified that sprinklers were good for "room and contents fires" that were based in a single room, but that "[a] house hit by lightning, a fire in the wall, deck fire, things like that, a sprinkler system would not be effective." Dominik testified that exterior fires posed greater risks to the neighboring structures than interior fires.

¶ 52                                  4. John Heinz

¶ 53 John Heinz testified that he is a senior construction manager who was currently contracted as the Village's public works director and had been retained by the Village to render an opinion to determine how plaintiffs' proposed development would impact public works operations. Heinz opined that the plan posed significant challenges to the utilities for the three homes, as well as refuse recycling, yard waste collection, snowplowing, tree preservation and protection, and storm water management. With respect to utilities, Heinz testified that each home would have water service, sanitary sewer service, electrical service, and natural gas service and would likely also have cable television and phone services. Each of these services would require a separate service line to each home, totaling 18 between the three homes, and each line would run from Old Glenview Road. With respect to the water and sanitary sewer services, Heinz testified that the services would require three access points to the main lines within 52 feet, which was unusual, including three separate cuts to the sewer line. Heinz also noted that the length of the sanitary service line would be "extremely long," which could pose issues with respect to maintenance in the future, and that one of the lots would require the service to change direction, which would "require somewhat of an extraordinary installation" as well as maintenance issues. Heinz testified that all 18 of the lines could physically fit in the space, "[b]ut with the constraints relative to the trees as well as the driveway, I think it can pose

problems in the future." Heinz also testified that—for purposes of trash, recycling, and yard waste pickup—the cans would take up a great deal of space on the Old Glenview Road curb. Heinz further opined that residents on the property would have issues keeping the driveway plowed and with visitor parking; Heinz testified that snowplowing was the property owner's responsibility.

### C. Plaintiffs' Rebuttal

#### 1. David Shindoll

Shindoll was recalled as a rebuttal witness and opined that, in developing the plan for the property, all the utility lines could fit onto the property. Shindoll testified that it would be "challenging," but that the challenges could be overcome "with some very detailed and careful engineering, which would be provided." Shindoll further testified that the plan for the driveway to be 20 feet wide and capable of holding 90,000 pounds was developed in response to feedback received from the Village, and the Village never indicated that it would refuse to use the driveway in emergency situations. On cross-examination, Shindoll testified that the information from the Village about the driveway was conveyed to the developer in a memorandum, but no memorandum was introduced into evidence.

#### 2. Lawrence Dziurdzik

Dziurdzik was also recalled as a rebuttal witness and testified that, in his experience, it was not unusual for common areas to be separate lots from the homeowners' individual properties. As an example, he pointed to the fact that he lived in a townhome development in Glenview and that his lot was separate from the lot that contained the development's common area.

#### 3. Plaintiff Rosa Levin

Levin was recalled as a rebuttal witness and testified that their plan was intended to preserve the trees on the property and that they intended to live in one of the homes. Levin further testified that there was nothing that the Village asked them to do that they refused to do.

#### 4. Leo Cox

Leo Cox testified that he was a former firefighter who worked for a company that conducted evacuation training and crisis management plans for high-rise buildings. He opined that plaintiffs' plan did not negatively affect the health, safety, and wellbeing of the occupants or nearby residents. Cox testified that the majority of calls to which the fire department responded were ambulance runs, not structure fires, and that Dominik had admitted that ambulances were allowed on driveways if necessary. Cox further testified that firefighters could manually carry ladders to the property, and that the spray from the hoses would reach any part of the structure that was on fire. Cox testified that he did not find any issues with the development plan that could not be overcome by a qualified fire department.

### D. Trial Court Order

On June 6, 2018, the trial court entered judgment in favor of the Village and against plaintiffs. The court noted that, in challenging the denial of a request for a variance, the

challenging party must establish by clear and convincing evidence that the ordinance, as applied, is arbitrary and unreasonable and bears no substantial relation to the public health, safety, and welfare of the community. The court further noted that our supreme court had set forth a number of factors to be considered in determining the validity of a zoning ordinance.

¶ 65    The court first found unpersuasive plaintiffs' argument that the requested variances were reasonable in light of recent trends in the neighborhood, namely, the construction of an eight-lot subdivision adjacent to plaintiffs' property. The court found that, unlike plaintiffs' plan, the subdivision was built around a public cul-de-sac, which allowed all eight lots to front a public way. The court further found that all eight lots complied with the minimum lot-width requirements and that no zoning variances were required for the development.

¶ 66    Next, the court noted that, while plaintiffs argued that measuring the lots from their midpoint would result in compliance with the lot-width requirement, Dziurdzik acknowledged that nothing in the Village's zoning ordinance called for measuring from the midpoint, and Roberts testified that she did not recall plaintiffs ever challenging the accuracy of the measurements. The court also noted that the fact that plaintiffs sought lot-width variances indicated that plaintiffs had accepted the Village's measurements. The court also found unpersuasive the claim that a high percentage of lots in the Village did not satisfy the lot-width requirements. The court found that, while Dziurdzik calculated that 38% of the lots in the neighborhood did not comply with the lot-width requirements, Pollock testified to the history of land development in the Village and the nature and purpose of the requirements and found that "the historical non-conformance with the minimum lot width requirement alone is not a sufficient basis to overturn the Village's decision to deny the variances requested by the plaintiffs."

¶ 67    The court further noted that, in Pollock's testimony, he explained that minimum lot width plays a significant role in determining the character of a neighborhood because lot width determined the amount of space between homes. Pollock testified that space between homes was important because it affected the amount of exposure that a home had to light and air, as well as the fire safety of a neighborhood. Pollock further testified that minimum lot-width requirements also determined the " 'rhythm' " of the local street or neighborhood, which was experienced by walking or driving down the street. The court also noted that Pollock had completed an analysis of all the lots in the Village in 2014 and had determined that only 43% of the lots in the Village conformed to the 60-foot minimum lot-width requirement; the court found that this was "significantly less than the 62% of conforming lots in the neighborhood of the Subject Property." The court further noted that, as part of the Village's zoning ordinance amendments, the lot-width requirements were changed in certain areas to bring most of the nonconforming properties into compliance.

¶ 68    The court found that, while Pollock might be biased due to his long relationship with the Village, his testimony was nevertheless credible, and his opinions were persuasive. The court found that a significantly higher percentage of lots in the neighborhood of plaintiffs' property conformed to the lot-width requirement than was the case in the Village as a whole. The court also noted that, in 2000, the Village implemented a comprehensive land use planning policy through its zoning ordinance and that variance requests needed to be consistent with that policy. The court found that granting a variance from the lot-width requirement would require the Village to depart from its policy. The court further agreed with Pollock that "what may have been done in the past should not dictate what is done in the future; otherwise, the Village

- 11 -

will find itself with more of what the plaintiffs call a 'hodgepodge' or 'crazy quilt' of lots." The court also found that, even though the homes would meet the side yard setback requirements, the space between homes would appear smaller because the homes would be set back so far from Old Glenview Road. The court found that the denial of the variances might prevent plaintiffs from achieving the highest and best use of their property, but granting such a request would be at the expense of the character of the surrounding neighborhood and the Village's legitimate fire safety and utility access concerns.

¶ 69    With respect to fire safety, the court found that the denial of the variances was reasonable based on the Village's concerns. While plaintiffs claimed that the private driveway they proposed would satisfy the Village's concerns and claimed that the Village specifically requested that they design the driveway in a certain way, the court did not find those claims persuasive, finding that Dominik testified credibly that the fire department never positioned its equipment on private driveways and noting that Shindoll's claim that the Village requested the driveway design was not supported by any documents in evidence. The court further found that plaintiffs' claim about the Village requesting a 20-foot driveway "would not make sense" because the Village's fire trucks spanned 20 feet with the outriggers, "leaving no room for error under the plaintiffs' 20-foot wide drive plan, particularly at the point where the driveway on the outlot curves and narrows to 12 feet as it[ ] approaches the residential lots." The court also noted that difficulty in positioning heavy equipment would be exacerbated at night or when snow was plowed to the sides of the driveway and that the ground sloped down from the side of the driveway into the rain garden, "again leaving no room for error."

¶ 70    The court found that the development plan presented an increased fire safety hazard for the Village and the surrounding neighborhood. The court noted that there were 10 to 15 homes in the Village that the fire department had difficulty accessing, that there were three private roads in the Village that were maintained by homeowners, and that there were instances where a fire truck would need to reverse out of a public way in order to leave a scene. However, the court found that "those are the rare exceptions" and that very few lots in the Village did not front a public way. The court found that Dziurdzik testified that every lot in the neighborhood of the subject property fronted a public way. Furthermore, the court found the fact that plaintiffs agreed to install sprinkler systems in the homes "does not eliminate the fire safety issues, particularly fires that start outside of a home, such as one caused by a lightning strike." The court found that "[t]he Village's consideration of worst-case fire scenarios is patently reasonabl[e]." The court considered Cox's testimony that any challenges could be overcome with thoughtful planning, but found that "the Village's decision to deny the plaintiffs the variances they requested because the distance between the public way and the rear residential lots would make it more difficult to fight a fire was in no sense arbitrary or capricious."

¶ 71    Additionally, the court found that providing utility services to the three proposed homes "would present significant challenges" because 18 separate service lines would need to be located within a small amount of space. The court further found that the difficulty would be exacerbated by the root zone of the trees on the front of the subject property. The court found that "while all 18 service lines could be accommodated with the 52-foot frontage, it would be a tight fit and leave little room for error." While plaintiffs correctly claimed that the homeowners would be responsible for the maintenance of utility services, the court noted that "the municipality is often the first place that a homeowner turns to when utility service is disrupted."

¶ 72    The court found that, even assuming that the value of the subject property would increase if the variances were granted, this factor must be weighed against the increased fire safety risks established by the Village. The court further found that there was no particular gain that would inure to the public in granting the variances; by contrast, minimum lot-area and lot-width limitations " 'help to sustain neighboring property values and promote the health and welfare of the public by preventing overcrowding and overuse of public services' " (quoting *La Grange State Bank v. Village of Glen Ellyn*, 227 Ill. App. 3d 308, 317 (1992)).

¶ 73    The court summarized its findings as follows:

"To conclude, the Village's denial of the plaintiffs' application for zoning variances is supported by the facts and circumstances of this case. The denial of the variances is consistent with the existing uses and zoning of nearby property, even if a significant number of homes in the surrounding neighborhood do not meet the minimum lot width requirement. In addition, all homes in the surrounding neighborhood front a public way, making the plaintiffs' development plan out of character. Although it is one of the largest residential lots in the Village, the Subject Property is not suitable for the type of development proposed by the plaintiffs. Moreover, the plaintiffs' development plan is inconsistent with the thorough and thoughtful approach to contemporary land use and development by the Village. Finally, although the Village is a mature community with few vacant parcels of land, that factor does not override the Village's legitimate concerns regarding fire safety and access to utilities.

The Village's denial of the plaintiffs' application for variances was not unreasonable, arbitrary or capricious. Accordingly, judgment is entered in favor of the Village and against the plaintiffs."

¶ 74    This appeal follows.


¶ 75                                   ANALYSIS

¶ 76    On appeal, plaintiffs claim that the trial court erred in finding that the Village properly denied the requested variances. "[A] variance is authority extended to a property owner to use his property in a manner forbidden by the zoning enactment, generally upon a showing of hardship. [Citation.]" (Internal quotation marks omitted.) *City of Chicago Heights v. Living Word Outreach Full Gospel Church & Ministries, Inc.*, 196 Ill. 2d 1, 17 (2001). "It is a well-established rule of law that the party challenging a variance has the burden of showing it to be invalid." *Dunlap v. Village of Schaumburg*, 394 Ill. App. 3d 629, 647 (2009).

"[I]t is primarily the province of the municipal body to determine the use and purpose to which property may be devoted, and it is neither the province nor the duty of the courts to interfere with the discretion with which such bodies are vested unless the legislative action of the municipality is shown to be arbitrary, capricious or unrelated to the public health, safety and morals." *La Salle National Bank of Chicago v. County of Cook*, 12 Ill. 2d 40, 46 (1957).

A zoning ordinance is presumed valid, and this presumption may be overcome only by clear and convincing evidence. *La Salle*, 12 Ill. 2d at 46.

¶ 77    The decision of a municipality to deny a request for a variance is subject to *de novo* judicial review as a legislative decision. 65 ILCS 5/11-13-25(a) (West 2006). *De novo* review generally means that the reviewing court gives no deference to the decision below (here, by the Village

- 13 -

Board), but instead undertakes an examination of testimony and makes an independent finding as though the action was originally instituted in that court. *Dunlap*, 394 Ill. App. 3d at 647. However, the fact that a zoning ordinance is a legislative enactment limits the scope of this review and does not mean that the reviewing court steps into the Village Board's shoes and exercises its independent judgment on whether the variance should be granted. *Dunlap*, 394 Ill. App. 3d at 648. Instead, the court's inquiry is "strictly limited to the question of whether there was any rational basis for the Village [B]oard's decision that such a variance was warranted." *Dunlap*, 394 Ill. App. 3d at 648.

¶ 78    In determining whether a variance was properly granted or denied, courts consider a number of factors set out by our supreme court in *La Salle*, 12 Ill. 2d at 46-47, which are commonly referred to as the "*La Salle* factors." These factors include:

"(1) The existing uses and zoning of nearby property [citations], (2) the extent to which property values are diminished by the particular zoning restrictions [citations], (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public [citations], (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner [citation], (5) the suitability of the subject property for the zoned purposes *** [citations], and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property. [Citations.]" *La Salle*, 12 Ill. 2d at 46-47.

Some courts also consider two other factors, set forth in *Sinclair Pipe Line Co. v. Village of Richton Park*, 19 Ill. 2d 370, 378 (1960): (1) the evidence of community need for the use proposed by the plaintiff and (2) the care with which the community has undertaken to plan its land use development. Our supreme court has made clear that no one factor is controlling. *La Salle*, 12 Ill. 2d at 47.

¶ 79    In the case at bar, as an initial matter, plaintiffs first claim that the trial court analyzed their claims as a facial challenge to the Village's zoning ordinance, not as an as-applied challenge to the denial of their request for a variance from the ordinance's requirements. In an as-applied challenge, a plaintiff claims that the ordinance is unconstitutional in the particular context in which the plaintiff acted or proposed to act, while in a facial challenge, the plaintiff claims that there is no set of circumstances under which the ordinance will be valid. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 305-06 (2008). Here, there is no basis to suggest that the trial court analyzed plaintiffs' claims as a facial challenge. The primary support for plaintiffs' claim is their focus on the fact that the trial court found that the Village was entitled to consider the "worst-case scenarios" in the context of determining fire safety risks. However, this in no way indicates that the trial court considered plaintiffs' claims as a facial challenge. Instead, the court's comments as to the fire safety risk occurred in the context of its analysis of the *La Salle* factors bearing on the decision to deny the variance. We also note that the trial court expressly observed several times during the proceedings that plaintiffs were bringing an as-applied challenge, as well as stating as much within its written decision. Accordingly, we find plaintiffs' claim otherwise to be unpersuasive.

¶ 80    Turning to consideration of the factors, we must bear in mind that the trial court is in a superior position to assess the credibility of witnesses and to determine the weight to be accorded the evidence, and we will not disturb the trial court's findings unless they are against the manifest weight of the evidence. *Kleidon v. City of Hickory Hills*, 120 Ill. App. 3d 1043,

1053 (1983). Additionally, "[w]here testimony is contradictory and it appears that there is only a fair difference of opinion as to the reasonableness of a zoning classification, the legislative judgment will prevail." *Kleidon*, 120 Ill. App. 3d at 1053. In the case at bar, after considering the *La Salle* factors, we cannot find that the trial court's findings were against the manifest weight of the evidence.

¶ 81     First, with respect to the existing uses and zoning of nearby property, all of the nearby lots are improved with single family homes and the property is located in the R1-A zone, which imposes a 60-foot lot-width requirement. Under Dziurdzik's analysis, 62% of the lots in the neighborhood complied with this lot-width requirement, and every home in the neighborhood, with the exception of the possibly occupied second structure down the street from plaintiffs' property, had frontage on a public street. No single family property in the Village had an outlot as proposed by plaintiffs, and Roberts testified that such a commonly owned lot was "very unusual" for the Village. Plaintiffs point to the recently constructed eight-unit subdivision as demonstrating that their proposed variances were in line with recent developments in the neighborhood, but as the trial court noted, all eight lots satisfied the lot-width requirements and had frontage on a public way. The court also noted that Pollock testified as to the effect that lot-width requirements had on the character of a neighborhood and found his opinions as to the effect of the development on that character to be persuasive. While plaintiffs challenge the trial court's reliance on Pollock's characterizations of the impact of lot width on the neighborhood's character, the trial court is in the best position to determine the credibility of witnesses and the weight to be afforded their testimony, and we will not second-guess its findings regarding such. Finally, as Pollock testified, the Village was affirmatively trying to establish a more uniform character in neighborhoods by amending the zoning requirements to more accurately reflect the properties; the zoning in plaintiffs' neighborhood continued to require a 60-foot lot width, indicating that this requirement was consistent with the neighborhood's existing character.

¶ 82     Second, with respect to the property's value, Schwarz testified that the value of the property as it currently stands was $450,000 as of the date of his most recent appraisal on November 10, 2013. With the three lots as proposed, the values of those lots would be $325,000, $330,000, and $335,000, representing a difference of $540,000.[3] However, Schwarz testified that his appraised value was not based on any information as to the actual homes to be built on the properties and rested on the assumption "that the proposed homes would be comparable and fit in well with the neighborhood." Additionally, Levin testified that she and her husband purchased the property for $105,000 in 1979, meaning that they have already increased the value of the property by a great deal. We also note that plaintiffs are not locked into an all-or-nothing proposition in which their options are the property as it currently stands or their proposed development. As the testimony of multiple witnesses established, plaintiffs could build a substantially larger home on the property without any variances. There was no evidence presented as to the value of the property if developed in such a way compared to the value of the proposed development. Moreover, even if there was some loss in value, our supreme court

_____

[3]In their brief, plaintiffs claim that there is "an estimated one-million-dollar difference in value." This number comes from the deposition testimony of Robert Levin, who did not testify at trial, and was unsupported by any evidence other than his own testimony. This value is also mathematically inconsistent with the numbers to which Schwarz testified at trial.

- 15 -

has made clear that "[i]t is not the mere loss in value alone that is significant, but the fact that the public welfare does not require the restriction and resulting loss." *La Salle*, 12 Ill. 2d at 47.

¶ 83        Turning, then, to the third factor—the extent to which the destruction of plaintiffs' property values promoted the health, safety, morals, or general welfare of the community—the trial court extensively commented on the testimony concerning fire safety and utilities. Plaintiffs point to the trial court's reference to a lightning strike as an example of an arbitrary basis to deny a variance and emphasize that their proposed homes would contain sprinkler systems. However, plaintiffs fail to recognize that the discussion of "lightning strikes" occurred in the context of Dominik's testimony about exterior fires and that Dominik specifically testified that sprinklers would not be effective in such a scenario: "[a] house hit by lightning, a fire in the wall, deck fire, things like that, a sprinkler system would not be effective." The concern, therefore, was not the remote possibility of a lightning strike specifically, but instead was about any source of exterior fire. Plaintiffs also dismiss the Village's concern about the aerial trucks as a "red herring," claiming that the homes would not be tall enough to require such equipment and that Dominik acknowledged that the Village would be able to fight a fire on the subject property if required. However, the trial court heard competing testimony from both Dominik and Cox and was entitled to conclude that Dominik's position as to the feasibility of fighting fires on the property was entitled to more weight.

¶ 84        The trial court also discussed the difficulty of ensuring that each of the lots had appropriate access to utilities, focusing on the challenge presented by the large number of utility lines required to be compressed into a small area. Specifically, in addition to the lines themselves, the additional services would require access to the main water and sewer lines three times within a small area, including three separate cuts in the sewer line, which Heinz testified was unusual. Plaintiffs challenge the trial court's focus on this issue, arguing that this was a more appropriate consideration during the permitting process, not during the zoning process. However, we see no error in identifying and considering such issues when determining whether there is an impact on the public health, safety, and welfare of the community. Additionally, while maintenance of the utilities is the responsibility of the homeowner, as the trial court noted, such issues are often raised with the municipality when there are problems, and consideration of such issues would again be relevant to the analysis of the impact on the public health, safety, and welfare.

¶ 85        With respect to the fourth factor, the relative gain to the public as compared to the hardship imposed on the property owner, the only hardship imposed on plaintiffs would be that they would not be permitted to develop the property into three buildable lots, meaning that their property would not receive its maximum value. See *Amalgamated Trust & Savings Bank v. County of Cook*, 82 Ill. App. 3d 370, 384 (1980) ("This is not a case where the plaintiffs are unable to use the property profitably. Their only hardship is that they are unable to realize as great a profit as they would like."). By contrast, as apparent from the discussion about the health, safety, and welfare of the community, denying the variance would leave the neighborhood without the additional strain on public services and without the risk of a difficult-to-reach fire. Having one home on the property as opposed to three would also reduce parking issues, as Heinz testified that three homes with visitors would "start to gobble up a fair amount of the street parking out there." "Minimum lot area and width limitations help to sustain neighboring property values and promote the health and welfare of the public by preventing

overcrowding and overuse of public services such as sewer and water." *La Grange State Bank*, 227 Ill. App. 3d at 317.

¶ 86　　With respect to the fifth factor, the suitability of the subject property for the zoned purposes, plaintiffs claim that the subject property is not suitable for standard residential zoning without the variances. However, the subject property has been used in conformance with the current residential zoning, with one home on the property, at least since the Levins purchased it in 1979. While the yard is much larger than the surrounding properties, that does not demonstrate that the property is not suitable for its current zoning. We must also note that the applicable zoning regulations were in place prior to the Levins purchasing the property, meaning that the current zoning cannot be said to be a surprise to them. They purchased the property relying on the existing zoning.

¶ 87　　The sixth factor considers the length of time that the property has been vacant as zoned, considered in the context of land development in the area. In the case at bar, the property is not vacant and has not been vacant for the entirety of the time that the Levins have owned it. Plaintiffs focus on the fact that, in their eyes, the property is underdeveloped, but the relevant question is not the highest and best use of the property for monetary gain, but whether the property has been developed and whether the highest and best use of the property complies with the health, safety, and general welfare of the community.

¶ 88　　Additionally, with respect to the two other factors set forth in *Sinclair*, plaintiffs have not demonstrated a community need for the use proposed by plaintiffs. At most, plaintiffs have claimed that the Village has a need for single family homes, as demonstrated by the building of the eight-home subdivision. However, plaintiffs have not shown that the Village has a need for homes located on lots of substandard width or homes that are not located adjacent to a public way. Furthermore, even if there was a need for single family homes such as those proposed by plaintiffs, such a community need would not outweigh the numerous factors weighing against allowing the variance.

¶ 89　　Finally, with respect to the care with which the community has undertaken to plan its land use development, Pollock testified extensively about the land development in the Village and explained the differences in development between the western and eastern portions of the Village. Pollock also testified that the Village undertook a project to amend its zoning ordinance to better comport with the existing development in the Village and to ensure that future development proceeded in a carefully planned way. The trial court found that the evidence demonstrated that the Village had a "thorough and thoughtful approach to contemporary land use and development," and we cannot say that this finding was against the manifest weight of the evidence.

¶ 90　　In balancing the factors, we agree with the trial court that the Village's denial of plaintiffs' requests for zoning variations was not arbitrary or capricious. The Village identified a number of concerns with the public health, safety, and general welfare of the community if the proposed development was allowed, and the addition of lots of substandard width that were connected to the public way only through an unusual commonly owned private lot did not comport with the character of the neighborhood. The property is suitable for use as a single family residential lot, as it has been used for years, despite the fact that the yard is much larger than others in the area, and plaintiffs remain free to build upon it in accordance with the zoning ordinance. "This is not a case where the plaintiffs are unable to use the property profitably. Their only hardship is that they are unable to realize as great a profit as they would like."

*Amalgamated Trust & Savings Bank*, 82 Ill. App. 3d at 384. Accordingly, we affirm the trial court's judgment.

¶ 91                                                    CONCLUSION

¶ 92        For the reasons set forth above, the trial court properly concluded that the Village Board's decision to deny plaintiffs' requested variances was not arbitrary or capricious.

¶ 93        Affirmed.